1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2

3     UNITED STATES OF AMERICA,        Docket No. 16-20089-01-JAR

4          Plaintiff,                  Kansas City, Kansas
                                       Date:  08/07/2017
5     v.

6     CLIFFORD CURRIE,

7          Defendant.
      . . . . . . . . . . . . . . . . . . . .
8

9

                      TRANSCRIPT (EXCERPT) OF JURY TRIAL
10                           CLOSING ARGUMENTS
                   BEFORE THE HONORABLE JULIE A. ROBINSON
11                    UNITED STATES DISTRICT JUDGE

12
      APPEARANCES:
13
      For the Plaintiff:    Ms. Kim I. Flannigan
14                          Mr. James Ward
                            United States Attorney's Office
15                          360 U.S. Courthouse
                            500 State Avenue
16                          Kansas City, Kansas 66101

17    For the Defendant:    Mr. Branden A. Bell
                            Mr. Kirk C. Redmond
18                          Federal Public Defender's Office
                            117 Southwest Sixth Avenue
19                          Suite 200
                            Topeka, Kansas 66603
20
      Court Reporter:       Kelli Stewart, RPR, CRR, RMR
21                          Official Court Reporter
                            259 U.S. Courthouse
22                          500 State Avenue
                            Kansas City, Kansas 66101
23

24

25

1              (1:50 p.m., closing arguments commenced).

2              THE COURT:  Okay.  Let's bring the jury in.

3              (The following proceedings were held in the

4    presence of the jury).

5              THE COURT:  All right.  You can be seated.

6    All right.  Ladies and gentlemen of the jury, I'm going

7    to read to you a rather lengthy set of instructions.

8    You're going to have written copies of these

9    instructions in the jury room as well.

10             I ask that as I read them-- they're going to

11   be displayed for you so that you hear them and see them

12   at the same time, that helps sink in a little better.

13   But I ask that you stay along with me as I read them.

14             And for now, Grant, we're going to read

15   through Instruction No. 38.  And then the last few

16   instructions, just about three of them, we'll save for

17   after the closing arguments.

18             All right.  So beginning with Instruction

19   No. 1.

20             (The Court read Instructions 1 through 38).

21             THE COURT:  All right.  That's all the

22   instructions we're going to read.  We just have a few

23   more to read after the closing arguments.  So we'll

24   return to them at that time.

25             All right.  If the government is ready for

1   the first part of its closing argument.

2            MS. FLANNIGAN:  Yes, Your Honor.  May it

3   please the Court.

4            THE COURT:  Yes.

5            MS. FLANNIGAN:  Counsel.

6            Members of the jury, on Wednesday,

7   September 7 of 2016, Katie Blanchard got up just like

8   any other day.  She got up, she got ready for work.  She

9   put on her uniform.  She kissed her kids goodbye just

10  like any other day.  She hopped in the car with her

11  husband.  He drove her to work.  When he dropped her

12  off, she kissed him goodbye just like any other day.

13           But that Wednesday last September wasn't

14  going to be like any other day.  And it wasn't going to

15  be like any other day because that was the day the

16  defendant had decided that he was going to carry out the

17  vicious and brutal attack against Katie Blanchard that

18  he had been planning for a very long time.

19           That was the day that he was going to murder

20  Katie Blanchard.  That Wednesday last September saw

21  Katie Blanchard doused with gasoline and set on fire.

22  It saw her fighting for her life on the cold floor of

23  the Munson Army Health Center.

24           That Wednesday last September was the day

25  that Katie almost didn't make it home to her children

1   and to her husband.  She laid on the floor afraid that

2   she was going to die alone.  That was the day the

3   defendant had scheduled for Katie to die.

4            Now that you have heard all the evidence and

5   the Court has now instructed you on what the law is that

6   you should follow, it's time for you to decide the case.

7   In order for you to find the defendant guilty of Count 1

8   of this indictment, we have had to prove three things to

9   you beyond a reasonable doubt.

10            The first one was that the defendant

11   intentionally struck or injured Katie Blanchard.  That's

12   not in dispute.  In fact, there's no evidence that

13   anybody else committed this attack.  And the defendant

14   doesn't dispute it, he acknowledges that he attacked her

15   that day.

16            Second, that the defendant did so with the

17   specific intent to murder Katie Blanchard.  And third,

18   that the defendant did this within a-- or on a

19   reservation that's within the special or maritime or

20   territorial jurisdiction of the United States.  The

21   Court just instructed you that if you find that this

22   attack occurred at the Munson Army Health Center, then

23   you can find that this element has been satisfied.

24            So let's return to the element that's in

25   dispute; the defendant's intent.  What evidence has been

1    presented to you that would allow you to go back to the

2    jury room right now and find that the defendant is

3    guilty of Count 1?

4           The judge just instructed you in

5    Instruction 24 that intent is a state of mind.  And

6    because we can't open up the defendant's head and we

7    can't look inside there to see what he intended, we have

8    to look at the evidence as a whole to determine what was

9    his intent that day.

10          The intent that the government has to show

11   is that he acted with malice.  In other words, that he

12   acted on purpose with the purposeful intent to kill

13   Katie Blanchard that day, to murder her, and not because

14   of an accident or a heat of passion.

15          So what evidence do you have before you that

16   the defendant acted with that kind of intent?  In May of

17   2016, the defendant had made some searches on his phone.

18   The defendant's phone recovered from the defendant's

19   office after the attack was searched.  And when it was

20   searched, the computer forensics analysis showed that

21   four months, four months before the attack occurred, the

22   defendant checked his phone, searched on his phone, if

23   you cut someone's neck with a knife, how long will it

24   take until they die?

25          So four months before he ultimately decides

1    to commit this attack, he's researching what kind of

2    crime-- how does he want to kill her.

3              Let's look now at what he did on the day of

4    the attack, on September 7th.  The defendant obviously

5    had decided that he was going to set her on fire, so he

6    had to take with him the tools that you would need to

7    set her on fire.  So the defendant grabbed a bottle of

8    water out of his cabinet and he filled it with gasoline.

9              What other tools was he going to need if he

10   was going to set her on fire?  He was going to need

11   matches.  So he grabbed the black box of Argosy casino

12   matches out of the tin that he kept in his kitchen and

13   he stuck them in his pocket.

14             What else did the defendant do that shows

15   that he was acting intentionally and not out of a heat

16   of passion?  He waited.  He waited until 5:00 to carry

17   out this attack.  You heard the testimony of almost

18   every witness who worked there that their shift, their

19   workday ended at 4:30.  So he waited until 5:00, maybe a

20   little after 5:00, because he believed that no one would

21   be there.  No one would be there to stop him and nobody

22   would be there to rescue her.

23             And if he had been right, if the defendant

24   had been right and Ms. Kilian and Doctor Ganacias hadn't

25   stayed late to finish their charging-- their charting,

1   he would've succeeded.  Katie Blanchard would've laid

2   dead at the defendant's hands if those two people hadn't

3   been there working late.

4          And because setting her on fire wasn't

5   enough, the defendant brought with him a razor blade.

6   Now, remember he had previously - four months earlier -

7   talked about how long it would take someone to die if

8   you cut their neck?  So he brought with him a razor

9   blade.

10          This is what the defendant looked like on

11   the day of the attack.  It's highly unlikely that the

12   defendant brought with him a razor blade so that he

13   could shave at work.  That was just another tool the

14   defendant was intending to use to commit the murder that

15   he had planned.

16          When the razor blade didn't work, remember

17   the testimony of Doctor Ganacias, the defendant went

18   back into his office and he grabbed a pair of scissors

19   out of his office.  Doctor Ganacias was on the floor

20   tending to her patient, Katie Blanchard, and she saw him

21   come charging out of his office with his arm raised high

22   and a pair of scissors.

23          She was so taken aback that she thought he

24   might be coming after her that she stepped away from her

25   patient to get out of his way.  And then she noted that

1   he was going to continue his attack on Lieutenant

2   Blanchard, and that's when she ran around behind him and

3   jumped on his back and tried to hold his arm and not let

4   him stab Katie Blanchard any further.

5         When Ms. Kilian and Doctor Blanchard [sic]

6   foiled his attempt to cut her throat and to stab her

7   with scissors, what was the testimony then?  He

8   attempted to stomp on her neck and finish the job.

9   Those are the facts for you to consider on whether the

10  defendant was acting with the intent to commit murder.

11        The defendant wants you to believe that he

12  was acting-- I want to go back.  The malice instruction

13  of No. 14 talks about what other things that you

14  consider when determining whether somebody acted with

15  malice, and that means with the purposeful intent to

16  commit the murder.  And one of those things that you can

17  consider is whether a weapon was used, an instrument was

18  used, or the manner in which the assault was caused.

19  It's hard to imagine any other manner of assaulting

20  somebody with more malice than setting them on fire.

21        The defendant wants you to believe that he

22  was acting in a heat of passion, that he felt upset and

23  his passion was aroused and, therefore, he-- he snapped.

24  Instruction No. 17, though, that's something that you

25  should consider in determining whether or not he acted

1   in a heat of passion, because heat of passion is defined

2   as a fear or rage in which the defendant loses his

3   normal self-control.  But it also says that if as a

4   result of the circumstances that would also provoke an

5   ordinary person.

6           So just because he's upset, just because

7   he's angry, that doesn't-- that doesn't stop the

8   inquiry.  The inquiry for you then is to determine would

9   an ordinary and reasonable person be that provoked and

10  take those kinds of actions.  And I think that the

11  evidence shows that that's not the case.

12          The defendant wants you to find that he is

13  not guilty of Count 1 because he was just so overwhelmed

14  by his dislike or his passion against Ms. Blanchard.

15  That's not the standard.  The standard, as is in this

16  instruction, is not just that he was upset or that he

17  was provoked or enraged but that a reasonable person

18  would be as well.

19          Let's turn to Count 2.  Before we turn to

20  Count 2, the government believes that there is

21  absolutely no reasonable doubt that the defendant

22  intended to commit murder on September 7th of 2016.  And

23  you can find him guilty of Count 1.

24          Only if you found him not guilty of Count 1

25  do you determine whether you should look at the

1   voluntary manslaughter.  So if you unanimously think

2   he's not guilty of Count 1, then you go on to look at

3   the-- the voluntary manslaughter instruction.

4          Now, let's look at Count 2.  Oh, before

5   that, sorry.  If there is a doubt, if there's any doubt

6   in your mind that the defendant was in complete control

7   of his faculties that night and he was completely aware

8   of what he had done and what he had planned to do,

9   remember this one thing:  When the firemen showed up

10  that night and they were concerned about what chemical

11  had been used, they were trying to determine how to

12  combat this chemical, the defendant is in another room

13  and he hears the firemen talking in the hallway.

14         And he hears them talking about, well, what

15  chemical might've been used, what do we need to do?  And

16  what does he say?  He says, "It's gasoline, you idiots."

17  He absolutely knew exactly what he had done and why he

18  had done it.  And it wasn't the result of a heat of

19  passion because in order for it to be a heat of passion,

20  he wouldn't have made all those planning steps to carry

21  out this crime.

22         So as I said, you have to unanimously find

23  the defendant not guilty of Count 1 before you look at

24  the heat of passion and voluntary manslaughter.

25         So Count 2.  In order for you to go back in

1   the jury room and find the defendant guilty of Count 2,

2   we've had to prove to you four things.  First, that the

3   defendant intentionally struck or injured Deanne Kilian.

4   There's really no dispute about that.  He struck her,

5   she was injured.  You saw the photographs of her

6   injuries and you heard the testimony of Deanne Kilian.

7          Secondly, that a dangerous weapon was used.

8   Third, that the defendant acted with the intent to do

9   bodily harm to Ms. Kilian.  And fourth, that it occurred

10  during [sic] the special and maritime and territorial

11  jurisdiction of the United States.  Again, that's not

12  disputed.  If you find that this act occurred at the

13  Munson Army Health Center, this element you can find as

14  proven.

15         So again, there was no doubt that Ms. Kilian

16  was injured.  You'll remember the testimony of Ms.

17  Kilian where she said that she felt-- all of a sudden

18  she felt the defendant pushing against her back and she

19  turned and she saw this sharp object and she put her

20  hands up.  Do you remember she testified-- she said, oh,

21  my God, this is going to hurt.  If I don't get ahold of

22  this, this is going to hurt.  And she was concerned she

23  was going to get her arm sliced wide open.

24         There's no doubt that a dangerous weapon was

25  used, whether that be scissors or a razor blade.  I

1   think you can find that either one of those meet the

2   definition of a dangerous weapon under the instructions.

3   What she saw was a sharp object, she thought it was

4   going to hurt when it cut her.  And so those elements

5   can be found by you.

6           So the real question then is whether or not

7   the defendant was intending to harm Deanne Kilian.  And

8   the answer to that question is yes.  Now, yeah, the

9   ultimate person he wanted to kill was Katie Blanchard,

10   but Deanne Kilian was in his way.  He had to get her out

11   of the way.  And when pushing against her back didn't

12   work, he raised that blade and he struck at her to get

13   her out of the way so that he could finish the job and

14   he could kill Katie Blanchard.  That was the defendant's

15   intent in striking Deanne Kilian with a dangerous

16   weapon.

17           Remember the testimony, that it was that the

18   defendant even continued to fight even after Lieutenant

19   Dahlen had grabbed him in a bear hug.  He was still

20   continuing to fight and try to get to her, to try to

21   finish the job that he started.

22           Ladies and gentlemen, at the beginning of

23   this case the United States got up here in opening

24   statement and we said that we were going to come back

25   after all the evidence had been presented and we were

1   going to ask that you find the defendant guilty.

2         Instruction No. 28 says that you're to use

3   your good sense and common judgment.  In other words, do

4   the facts of this case make it so-- the facts of this

5   case are not particularly difficult.  And you're allowed

6   to use your common sense, the common sense that

7   everybody has in determining what was the defendant's

8   intent that day.

9         We ask that you do that, that you use your

10  good sense and your-- your good common sense and your

11  judgment.  We ask that you find the defendant guilty of

12  this horrible and vicious attack on Katie Blanchard and

13  Deanne Kilian.

14        He set Katie Blanchard on fire and he stood

15  there hoping to watch her die.  The evidence is

16  overwhelming of the defendant's guilt.  We ask that you

17  find the defendant guilty because he is guilty.  Thank

18  you.

19        MR. BELL:  May it please the Court.

20  Counsel.

21        You don't try to set somebody on fire unless

22  you're really mad at them.  This case has been about the

23  difference between a heart crime or a head crime.  We

24  talked a lot about heart versus head during jury

25  selection.  It's not about whether Mr. Currie is guilty

1    of any crime.  He is.  The question is which crime is
2    Mr. Currie guilty of?  And to answer that question, you
3    have to decide was this a head crime or was it a heart
4    crime?
5              Now, what do I mean by that?  Well, we have
6    a brain, we have minds.  Right?  We reflect on things,
7    we have judgments.  Sometimes you can come to a cool
8    rational decision.  And sometimes people come to a cool
9    rational decision to commit a crime, like a bank robber.
10   Right?  A guy is going to walk into a bank, shoot the
11   teller, take the money and leave.  Right?  The guy
12   doesn't know the teller.  Right?  Has no reason to be
13   mad at the teller.  It's just a plan.  They've weighed
14   the pros and cons of it and have decided this is what I
15   want to do.  Right?  That's a head crime.
16             And then there are heart crimes; heat of
17   passion crimes, anger crimes, rage crimes where you do
18   know the person that's going to be hurt.  And you're
19   angry at that person.  And the reason that you want to
20   do that, the reason that you're going to commit the
21   crime is because of that anger, because of that rage.
22   That's a heart crime.
23             So this case has never been about whether
24   Clifford Currie committed a crime.  It's not whether he
25   deserves to be punished and it's not whether Ms.

1    Blanchard or Ms. Kilian deserve your sympathy.  No one

2    is going to ask you to answer any of those questions on

3    your verdict form.  The real question for you, is this a

4    head crime or a heart crime?

5              So let's start with Instruction 13.  And the

6    reason this is important is because the intent to commit

7    murder is more than just an intent to kill.  All right?

8    Murder is an actual offense, it has a legal definition.

9    And part of that definition is that it has to be with

10   malice.  All right?  Malice is a mental state that

11   somewhat counter-intuitively means not necessarily

12   because you're angry at somebody but just because there

13   was a premeditation involved, right, that you-- that

14   it's a head crime.  Right?

15             So you see murder as it's defined in the

16   statute is a head crime, just like a bank robbery.

17   Right?  You think about it, you come to a judgment, you

18   decide that you're going to do something.  Not because

19   you're angry at somebody but because you've weighed it

20   out and you've decided from a rational perspective that

21   the pros outweigh the cons, benefits outweigh the risks.

22             And right there in Instruction 14 it says to

23   find malice you don't even need to be convinced that the

24   defendant hated the person assaulted or felt ill-will

25   toward the person assaulted.  Again counter-intuitively,

1    malice means that it's not based on hatred, it's not

2    based on ill-will.  And murder requires the element of

3    malice.  Murder is a head crime.

4              And you look again at Instruction 13.  The

5    first sentence there-- or second sentence.  "Murder is

6    the unlawful killing of a human being with malice."  And

7    again counter-intuitively, malice means it's not based

8    on hatred, not based on rage, just a cool reasoned

9    decision to do something.

10             But if there is heat of passion, if the

11   heart is involved, if it's emotional, if it's rageful,

12   then that means there isn't malice.  And to look at

13   that-- as you can see that from Instruction No. 13 as

14   well.  The second sentence-- third sentence.  "To

15   establish malice the prosecution must prove beyond a

16   reasonable doubt the absence of heat of passion,"

17   because the two things aren't-- you can't have both.  If

18   there is heat of passion, if there is anger, if there's

19   emotion, if the heart is involved and your head is not

20   functioning right, then that's not malice.  All right?

21   That's heat of passion.  And heat of passion is a heart

22   crime.

23             Specifically for this case, heat of passion

24   is rage.  Instruction No. 17 tells you heat of passion

25   is a passion or a rage in which the defendant loses his

1    normal self-control as a result of circumstances.  Now,

2    this is important.  It doesn't mean that an ordinary

3    person would be so mad at these circumstances that

4    they'd be driven to kill.  It doesn't mean that an

5    ordinary person would be so angered by this that they'd

6    be driven to set anybody on fire.  It just says, would

7    an ordinary person lose their temper, lose your normal

8    self-control for these circumstances.

9            And it's not because-- this case is not

10   about whether Ms. Blanchard was a good boss or a bad

11   boss, whether Mr. Currie was a good employee or a bad

12   employee.  It doesn't have to be as a result of what Ms.

13   Blanchard did to him, right or wrong, it's not what this

14   case is about.  It's about the circumstances.  Right?

15   The circumstances.  And the instruction tells you if

16   those circumstances would cause someone to lose their

17   temper, to lose their self-control where their brain is

18   not really in control of-- of itself anymore and you're

19   acting on emotion, then it becomes a heart crime.

20           And that's why heat of passion-- if you find

21   that or if the prosecution doesn't disprove heat of

22   passion beyond a reasonable doubt, your verdict becomes

23   attempted voluntary manslaughter.  You look at the third

24   element there, "While in the heat of passion, and

25   therefore without malice," in the elements in

1    Instruction 15 for attempted voluntary manslaughter.

2            So that's why when you look at the verdict

3    form what we're going to be asking you to do is check

4    "guilty" on attempted voluntary manslaughter, because

5    that's the heart crime.  That's the crime that comes out

6    of rage.  It doesn't excuse anything Mr. Currie did.  It

7    doesn't mean he shouldn't be punished, doesn't mean that

8    he's not guilty of any crime at all.  The question is

9    just which crime is he guilty of.

10           Now, I want to be very clear to explain why

11   this is a heart crime and to walk you through the-- why

12   these circumstances made Mr. Currie lose his temper.

13   We're going to walk through the last few months that he

14   had at Munson Army Health Center.  None of the things

15   that happened to him justify what he did.  Right?  Nor

16   is that what we're arguing.  And nor is that what the

17   law requires you to find.  All right?  None of them

18   justify what he did in this case.

19           But to understand how he lost his temper, we

20   need to go through those months to see what was

21   happening to him.  And to start, we need to know who Mr.

22   Currie is.  Well, we know he was in the Navy, served

23   four years in the Navy.  We know he has a bachelor's

24   degree in computer science with a minor in mathematics.

25   All right?  So he's been trained both as military

1    experience and in school to be an organized planner.

2    Right?  He's got some organizational background here.

3    We know that he worked as a child support enforcement

4    officer for the State of Kansas for a number of years

5    collecting child support from dead-beat dads.

6            And then we know he worked at Munson for--

7    at the time of the event about four years at this time

8    that he held that position.  And you remember the people

9    that testified that they knew him before the Army sent

10   Ms. Blanchard to deal with him; that he was nice, he was

11   polite, soft-spoken, social, sort of like a jolly Santa

12   Claus figure.

13           And this is the story of how that person,

14   that nice, polite, jolly person deteriorated into

15   something who did something so horrible.

16           So the first thing we see is we have the

17   January 26th incident.  Right?  So Ms. Blanchard starts

18   supervising him in October.  November she goes on leave.

19   Gone during December of 2015.  January 2016 is when she

20   says that's when the tension really gets worse when I

21   get back.

22           And they have this confrontation, this

23   blowup on January 26th.  She's in his office messing

24   with his files.  He asks her not to do that.  She says,

25   I have to do it.  And he explodes.  All right?  A flip

1    gets switched-- a switch gets flipped and he starts

2    yelling at her.  She says, I'm surprised, I didn't

3    expect that.  I didn't think that was going to happen.

4    Right?  From 0 to 100 just in a second.

5             Now, obviously the tension that she had

6    described when she testified had been building on him

7    for quite a while.  Right?  But she couldn't see it, she

8    was surprised when his reaction was like that.  He had

9    just been stewing and being a good-- doing a good job of

10   hiding it.

11            And then in this letter he explains how he

12   felt during that meeting.  He was intimidated and

13   emotional.  Made to feel inferior, always treating me

14   like I'm stupid, intimidating, insulting.  And he was in

15   an emotional state.

16            Now, again, right or wrong, right, whether

17   it was okay for him to take it that way or not, this is

18   how he feels.  Right?  Every witness that testified

19   about you says, yeah, he honestly feels that way.

20   Right?  He takes that and feels this way.  Whether Ms.

21   Blanchard is a great boss or a bad boss doesn't matter,

22   this is how he honestly feels.  He's angry.

23            So after this January 26th incident, we have

24   the e-mail from John Kent, the commander of Munson,

25   right, on February 4th.  And Munson [sic] says, "I'm

1   working to remove the current EFMP program person,"
2   which is Mr. Currie.

3              This will become important because later on
4   everyone says that they're trying to help Mr. Currie get
5   back on track and get his job right and whatever.  The
6   decision has already been made by people that outrank
7   Ms. Blanchard and people that outrank Ms. Zickefoose
8   that he's got to go.  And so now they're going to try
9   and figure out a way to make him go.

10             So 47 days before the incident, Mr. Currie
11  gets the PIP.  Now, we heard about-- testimony about how
12  tension had been building, that there was an attitude
13  problem, that everyone could feel it before he gets the
14  PIP in July.  But now things are real, right, because
15  now they're coming for his job.

16             Remember we heard the testimony that there
17  are two ways to get rid of an employee; either for
18  discipline, right, they're not following the rules,
19  they're being disrespectful, discourteous.  Or
20  performance.  Right?  This is the way to get rid of him
21  through performance.

22             Now things are real for Mr. Currie, now his
23  job is in danger.  Now he knows that they're going to
24  try and get rid of him and he feels like they've set him
25  up to fail.  Right?  If you look at part of the PIP, it

1    tells him, "Although you're going to have access to

2    other staff in unique situations, you're expected to

3    work independently."

4           Also the PIP tells him that there's an

5    assistant that will be provided but just for

6    administrative duties.  "The assistant should not be

7    expected to do your work."  Well, Mr. Currie reads this,

8    thinks to himself, well, I'm still on my own, they're

9    setting me up to fail.  Because he has told them,

10   remember, for the past three-and-a-half years, I've been

11   telling everybody there are not enough hours in the day

12   to do this job.  I can't do it in 40 hours.  Right?

13   I've said this, other people have said it.  Ms. Harris

14   even told you.  She used to have the job.  Can't do it.

15          So if you can't get your job done in 40

16   hours in a week, what are your options?  You either get

17   help, you're going to stay late, or you can work on

18   weekends.  Couldn't have help.  We know he couldn't stay

19   late, and we know he couldn't work weekends.

20          So he's told them all this.  He said this

21   job can't get done in this amount of time.  But they're

22   telling him in this plan that he has to have the job

23   done in this plan or they're going to fire him.  He

24   feels like they're setting him up to fail.

25          And again he's told them here, I just don't

1    have enough time in the day to accomplish all my daily

2    activities, respond to voicemails, e-mails, new

3    referrals, and complete the paperwork that is

4    backlogged.  He's told them all this before, it's not

5    like they don't know it, that he hasn't expressed the

6    complaint.  And he's asked to work weekends, right, but

7    we know he wasn't allowed to work weekends.  So the job

8    is more than one person can do in 40 hours.  No help, no

9    weekends, no staying late.

10             Also as part of the PIP he has to start

11   meeting with Ms. Blanchard every day 15 to 20 minutes.

12   Now, these people already don't get along.  Right?  Mr.

13   Currie has even explained how bad he feels even being

14   around her and how she makes him feel.  Right?  Even the

15   government has said at the beginning, at the very

16   beginning there is tension right off the bat between

17   these two, all the way back in November.  Right?  It is

18   the opposite of love at first site.  There's some people

19   that just aren't going to get along together for

20   whatever reason, and these two people are not going to

21   get along.

22             42 days.  Mr. Currie responds to the

23   disciplinary complaint from the January 26th incident.

24   Sends this on July 27th.  And the first sentence, "In

25   response to the proposed suspension that Ms. Blanchard

1   is requesting for her accusation." That's consistent

2   with everything else we heard. Right or wrong, Mr.

3   Currie blames Ms. Blanchard for what's happening to him.

4   Right? It's not discipline that command is requesting

5   or the handbook requires, it's that Ms. Blanchard has

6   requested for him. And he says, I've asked multiple

7   times for a new supervisor. That has never happened and

8   it appears it may never happen.

9            And you can tell even back on July 25th--

10  the end of July, "Each and every day she addresses me in

11  a condescending tone." I'm intimidated, emotionally

12  distraught, nervous, anxious, continued mistreatment.

13  This is how he feels. He legitimately feels upset,

14  angry, rage.

15            So let's stop here for a second because a

16  question would occur to anybody, well, like why doesn't

17  he just quit. Right? If the job is really this bad for

18  him, if he's really emotionally distraught and nervous

19  about this, why doesn't he just leave? Well, the answer

20  to that question is actually in the last sentence of

21  this-- this document. He says, "This 7-day suspension

22  would affect my family's financial well-being."

23            Mr. Currie is not independently wealthy.

24  Right? He's living paycheck to paycheck. He can't

25  afford to just quit and hope that he's going to find

1   another job.  And there aren't that many jobs out there

2   for 50-year-old computer programmers.  He needs this

3   job.  He doesn't feel like he has the option to just

4   walk away.

5          35 days before.  Mr. Currie and Ms.

6   Blanchard have another incident.  Mr. Currie is

7   explaining this incident.  It happens on August 3rd.

8   "Formally requesting to have a new supervisor."

9   Continual berating, scolding, spoken to condescendingly,

10  disrespected, intimidated, treated like a subhuman and

11  generally threatened.  Ms. Blanchard was accusing me,

12  berating me, intimidating me and she has absolute

13  control over the outcome of the PIP.

14          And he even tells her again during this

15  incident - just like in the January 26th - they have a

16  confrontation, he says, I need to leave, I need to get

17  out of here.  This is a volatile situation.  I just need

18  to remove myself out of here.  And that's what he does.

19  Right?  Just like in the January 26th confrontation.

20  It's like this is emotional, I need to go, I need to

21  escape, I need to leave this place.  And he takes

22  himself out of the situation.

23          And we have his belief right here.  She's

24  incapable of being an objective observer as it relates

25  to me, my PIP, and my general well-being.  I get

1    physically and emotionally ill anytime she comes near

2    me.  Please give me another supervisor.  Please give me

3    somebody different.

4            23 days before.  Ms. Blanchard sends Mr.

5    Currie to the EAP program for aggressive behavior.  All

6    right?  The anger is building, the tension is building

7    in Mr. Currie.  As a result of that, the next day-- now

8    command has told Ms. Blanchard because she's worried

9    about Mr. Currie's anger that she needs to bring

10   somebody else into these daily meetings.

11           Well, nobody tells Mr. Currie about that.

12   Mr. Currie doesn't know why there's now a spectator at

13   each of these meetings.  All he knows now is someone is

14   coming to witness his daily humiliation, his daily

15   berating, his daily scolding, his daily being made to

16   feel like he's stupid.  He doesn't know why now

17   spectators are now coming in here.  And it makes him

18   more angry.  All right?  You really have to bring

19   someone in here to watch this?

20           21 days before.  Mr. Currie asks for a set

21   schedule for these meetings.  He says they're at

22   inopportune times, I can't get my work done when they're

23   going on, please just give me a set time you're going to

24   come in for these meetings so I can get my other stuff

25   done.  Denied.  Doesn't happen.

1              And we know that Mr. Currie is capable of

2    doing his work because the one week that Ms. Blanchard

3    is gone, he gets all of his work done.  Right?  Ms.

4    Zickefoose told us about this.  And they asked him, why

5    can't you do this when Ms. Blanchard is here?  And he

6    says, because of her.  Because when I have these daily

7    meetings with her all the time and she's watching

8    everything I do, I can't get anything done.

9              Now, imagine-- everyone acknowledges Mr.

10   Currie is the subject matter expert in this program.

11   Right?  Even if it's failing because he doesn't have

12   enough help or enough work or whatever reason, he's the

13   one that knows this program best.  And he has told them

14   it can't get done in this amount of time.  It can't get

15   done in this way.  And if you'll just let me do my

16   thing, I can get it-- and give me some help, I can get

17   it done.  All right?

18             From his perspective he's being set up to

19   fail.  He knows what the program takes.  He knows he

20   alone can't do it, he's trying his best to get it done.

21   And no one will listen to him about why the program has

22   these problems.  And he-- this all started when Ms.

23   Blanchard came and-- came and started supervising him

24   and so he thinks it's her fault that all this is

25   happening.

1              Of course, what he doesn't know is that he's

2    not wrong.  Right?  In February the decision was made to

3    try and get rid of him.  And that's what this is about.

4              15 days before.  We have another

5    confrontation between Mr. Currie and Ms. Blanchard.

6    See, after the PIP in July things start happening

7    faster.  Right?  It's-- things are escalating, they're

8    happening much quicker now.

9              Ms. Blanchard describes the meeting in an

10   e-mail; that they had a meeting that morning, Mr. Currie

11   was upset, he's agitated and confrontational.  And then

12   at 10:47 that morning, Mr. Currie had sent an e-mail

13   saying, "I'm not feeling well, I need to leave."  Same

14   thing from January, same thing earlier in August.  They

15   have a confrontation, he needs to go.  Right?  He needs

16   to just get out of the situation and calm down.

17             Ms. Blanchard says, I go to his office a few

18   minutes after he sends this e-mail and he's gone.  And

19   then asks, "Is not approving his leave and moving his

20   status as AWOL an option?"  And we're going to find out

21   that it was.

22             13 days.  Currie is told that his leave is

23   disapproved.  He gets this e-mail from Ms. Zickefoose.

24   My policy is to deny any leave requests that haven't

25   been vetted through a supervisor first.  Now, we heard

1   that there's no way Mr. Currie could've known about

2   that.  Right?  He's been working there for about four

3   years at this point and it's never a policy that was in

4   there before.  He sees this and he says, oh, well, okay.

5   I didn't know about that rule.

6           12 days before.  Not only did he-- is there

7   this new rule about leave, now he finds out he's going

8   to be in trouble for breaking the new rule that he

9   didn't know about.  All right?  He sends an e-mail to

10  Ms. Harris like they approved-- the leave was approved

11  when I took it.  I sent you this e-mail that says that,

12  it's attached.  Are they going to try and unapprove it?

13  And then Ms. Blanchard told me today that it was

14  unauthorized leave.  I don't know anything about

15  unauthorized leave.

16          Sends another e-mail that day.  Hernandez

17  who previously approved my leave came into the office

18  and told me that he had been told that he wasn't

19  authorized to approve the leave as he had done in the

20  past on many occasions.  Right?  This is something Mr.

21  Currie has done before, never been told it's a problem.

22  But now he's being told that he can't take leave in this

23  way.  And when he asks what the repercussions are going

24  to be, Hernandez tells him he doesn't know.

25          Six days before the incident.  There's an

1    e-mail from Cliff Lovett that says, look, why is Mr.

2    Currie's timecard account being processed as leave

3    without pay?  He's got plenty of leave accumulated.  Why

4    can't he just do it that way?  Why can't he just use the

5    leave he's already got accumulated?

6              Ms. Zickefoose; well, he's being processed

7    that way because he didn't let his supervisor know he

8    was leaving/out for the day.  Which we know that's not

9    true because she's copied on the e-mail, he does tell

10   her that he's leaving for the day.

11             Mr. Lovett, "I thought she was going to go

12   with AWOL, which is a different time code, plus it

13   serves as a purpose."  What purpose is that?  To get rid

14   of Mr. Currie.  Right?  A disciplinary action that's

15   going to get rid of him.

16             So what does Mr. Currie take from this?  All

17   right.  In the past there's this pattern; there's a

18   confrontation, I withdraw.  There's a confrontation, I

19   withdraw.  Now he's being told there's a confrontation,

20   if he leaves to get out of it he's in trouble.  He's

21   going to potentially lose his job.  Can't do it.  If

22   there's a volatile situation and he tries to get out of

23   it by leaving work, he's going to put his job at risk.

24             September 7th, five hours before.  Currie

25   and Blanchard have another altercation.  Ms. Blanchard

1    actually e-mails Ms. Zickefoose about it shortly after

2    it happens.  "I had a behavioral issue with Mr. Currie."

3    He's unable to conduct himself in a respectful manner

4    and he's now working on this thing that's due at the end

5    of the day by himself.

6              Now, we know that's not all that happened

7    during that meeting.  Right?  Ms. Blanchard testified

8    about it.  And she says she's going over the meeting--

9    the spreadsheet with him that's due by the end of the

10   day and says, do you understand what the problem is?

11   Mr. Currie can't help it anymore.  He says, you're the

12   problem.  You are the problem.  All of a sudden just

13   starts shouting.  She says, you need to get out of the

14   office.  Get out of here.  This says, working on it by

15   himself now.

16             Later that afternoon, as Ms. Zickefoose told

17   us, she and Ms. Blanchard have a conversation about Mr.

18   Currie and saying things are at a tipping point with

19   him.  Things are happening back-to-back-to-back now.

20   He's going to break.  And they're right.

21             One hour later-- one hour before it happens,

22   Mark Catron says he sees Mr. Currie pacing in the

23   hallway, right, like this (indicating).  He's wringing

24   his hands, staring into Blanchard's office.  Catron

25   says, I've worked for [sic] the guy for years, never

1    seen him do that.  No one has ever seen him do that.

2    Right?

3              And then finally the final insult.  He's

4    supposed to leave at 4:30.  He stays, they have this

5    thing due that day at 5:00.  She comes to his office and

6    says, time to go, can't work late.  I know this thing is

7    due today, got to get out of here.

8              And that's the straw that breaks the back

9    for Mr. Currie.  That is the final straw for him.  I

10   have this thing due today.  You're going to get mad at

11   me for not going it.  It's going to affect my job.  I've

12   told you that this can't be done by one person, me, by

13   the end of the day in 40 hours a week.  It just can't.

14   And finally it just becomes too much for him.  He's had

15   enough of the berating, enough of the scolding, enough

16   of the made to feel like a subhuman, it just becomes too

17   much.  It's too much for him and the flip gets switched.

18             So what does he do?  Grabs a water bottle

19   out of the trash can.  Right?  We know he's got several

20   in there.  This is the photo that Ms. Fontaine took the

21   day after the search of his office.  Right?  Brings

22   several of them from home.  There's an empty one in

23   there, grabs it.  Right?

24             And then how does he get the gasoline?

25   Well, we know it wasn't from his house because the guy

1   from the FBI told us, the explosives expert, the

2   gasoline from the house is inconsistent from the residue

3   that we found on the bottle that he uses.  So the

4   residue on the bottle that was used at the scene had

5   diesel on it.  And where do we have diesel, what did the

6   expert tell us?  Generators.

7            No one at the FBI ever asked anybody at the

8   hospital, is there any gasoline around here?  But if

9   they did-- and your common sense tells you hospitals

10  have backup generators.  Mr. Currie is in the Navy.

11  Those have electricities from generators.  Goes

12  downstairs, or upstairs, wherever the generator is in

13  the facility, fills it up and takes it back upstairs.

14           How do you know this is where it happened?

15  How do you know he didn't bring it from home?  Well,

16  first off, the bottle itself is inconsistent with the

17  gasoline at his house.  But second off, remember what

18  Ms. Fontaine told us, that the smell was so bad that the

19  firefighters the next day said, we've got to get in here

20  because the smell of gas coming out of this office is

21  just too much.  Because he spilled it on the floor of

22  his office.

23           I mean, that's the only reason that fumes

24  are so bad in his office that they're dangerous.  How

25  else do we know that that's where the gasoline was

1  gotten?  Because his clothes smell like gasoline.

2  Right?  Remember, he's worked the entire day that day.

3  No one says his clothes smell like gasoline during the

4  whole day.

5            But when he gets to the ER, what does the

6  nurse say?  It was an overpowering odor of gasoline

7  coming from-- coming from his clothes.  Right?  The only

8  way that odor gets on the-- gets on his clothes is if he

9  spills it on himself when he's getting the gasoline.

10 And the only place that he's going to get the gasoline

11 and get the odor on his clothes is at the hospital.  And

12 the only explanation consistent with the residue found

13 on the bottle is that he got it from the hospital.

14           Takes it up, goes into his office long

15 enough to grab the matches because his hands are shaking

16 so bad he's spilling the gasoline on his clothes, on the

17 floor.  Grabs the matches, goes in, and his hands are

18 shaking so badly even when he gets into Ms. Blanchard's

19 office.  You heard that they found an unlit match on the

20 floor.  He can't even get the first one to go.  That's

21 how angry he is.  It just takes a second to do it.

22           And, in fact, he's so angry that-- this

23 wasn't a scheduled plan for him to do so and it wasn't a

24 planned out thing at all.  He's so angry, he leaves

25 everything in his office.  There's no Step B here for

1    Mr. Currie.  Right?  Leaves his ID card plugged into his

2    computer, leaves his computer on.  The lights in his

3    office are on.  Leaves the cell phone plugged in to his

4    window sill.  If it's something this carefully planned

5    and plotted and scheduled, what's Step B?  How are you

6    going to get away from this?

7              All of this evidence shows this is somebody

8    who just jumped out of their office and left to do

9    something.  And why, why is there no plan to at least

10   unplug your phone or wipe your phone or get your car

11   keys or your wallet or make a-- a hasty retreat for the

12   exit?  Because it's not a plan at all, it's just rage.

13             And if you need any further explanation for

14   that, remember, this is the diagram.  Right?  This all

15   happens here.  Then we hear the testimony about Mr.

16   Currie running back to his office, which is here, to get

17   the scissors.  Right?  And then he runs back.  But

18   remember what's up here (indicating).  That's the exit.

19   Right?

20             Lights her on fire.  He's so mad that he

21   doesn't-- he's staring right at the exit sign as he's

22   running back down the hall, doesn't think about leaving,

23   doesn't think about trying to escape.  Because the

24   government is right, what he wanted to do out of all

25   sense of rationality or proportion or judgment was to

1   get rid of Ms. Blanchard.  Right?  He told Ms.

2   Zickefoose that.  If she would just go away, all of this

3   would be okay.

4           He doesn't run for the exit even when his

5   plan has failed because there was no plan.  He's just

6   acting on instinct at this point.  Right?  He's got the

7   razor in his hand, doesn't even try to use the razor.

8   He goes back for scissors.  Why would you even need

9   scissors if he's got the razor in his hand?  There's no

10  judgment here.  It's just anger.

11          In fact, all the circumstances surrounding

12  it show that it was no thought-out plan at all.  If it's

13  a plan of reason, of cool judgment, why does it have to

14  be in the hospital?  Right?  They park in the same

15  parking lot, presumably he could follow her somewhere

16  off hours if he wanted to.  He could stalk her.  He

17  could do it a lot better and make sure that he was going

18  to get away with it or at least lessen the chance that

19  he was going to get caught, but he doesn't do that.

20  Why?  Because he's not thinking.  It has to happen now.

21  I'm so angry.  It has to happen now.

22          So he doesn't think about what his escape

23  plan is.  There's no planning it out.  And this idea

24  that he searched four months prior about how to cut

25  somebody's neck, it might be relevant if he actually had

1    attempted to cut her neck and if that's the way that he

2    went about it.  But that's not what he did.

3              Maybe if there had been some searches about

4    how do you set somebody on fire before the-- before the

5    event or what's the best way to get away from the

6    hospital or where are non-extradition countries that I

7    can escape to, right, those are all cool, reasoned

8    judgment plans, all searches that would show that that

9    was the intent.  But there's none of that happening

10   here.  All the evidence shows is that he got enraged and

11   ran out of his office and didn't make a single plan

12   after that.  There was no Step B for him.

13             The assault of Ms. Kilian.  Here the

14   government has just charged Mr. Currie with the wrong

15   crime.  If you look at the first element, you have to

16   find beyond a reasonable doubt that he intentionally

17   struck or injured Ms. Kilian.  That he intentionally

18   struck her, meant to strike her.

19             What did Ms. Kilian tell us?  I saw a razor

20   blade coming down to Ms. Blanchard, I put my hand up and

21   said, man, this is really going to hurt if this gets me.

22   And then it didn't hurt.  Right?  Her arm didn't get all

23   cut up the way she thought it would if she got hit with

24   the razor.  And then when we asked her, do you remember

25   how exactly you got the cuts on your hand?  Not really.

1          Third element; that he acted with the intent

2    to do bodily harm to Deanne Kilian.  Not that she just

3    got in the way, not that he was negligent and he did

4    hurt her, but that he meant to hurt her.

5          Everybody's testimony that was there at the

6    scene said he was-- Mr. Currie was focused on one person

7    and one person only, and that was Ms. Blanchard.  No one

8    told you that it looked like he was trying to hurt Ms.

9    Kilian.  Ms. Kilian didn't even say it looked like he

10   was trying to hurt me.  She said, I tried to get in the

11   way when the razor came down.  And that if the razor had

12   hit me, it was going to hurt a whole lot, but it didn't.

13         If the government had charged Mr. Currie

14   with just injuring Ms. Kilian negligently or recklessly,

15   that he tried to hit Ms. Blanchard but instead hit Ms.

16   Kilian, then that might be a tougher argument and the

17   evidence would support a conviction under that crime,

18   but that's not what they charged him with.  They charged

19   him with acting with the intent to hurt her, and there's

20   just no evidence that that's what he was trying to do.

21         "It's gasoline, you idiots."  If this was

22   part of a plan, can you think of a dumber thing to say

23   at that point?  All right, he's caught.  The police have

24   him in the room.  The firefighters are asking questions

25   about it.  If this is part of a plan, you've just

1    confessed.  All you've done is shown that you're going

2    to be-- that you planned on what you were doing.  You've

3    just shown that you know what's going on.

4           Instead it's because, once again, he can't

5    control himself.  He's still angry.  And he's so angry

6    he's calling the firefighters idiots who are walking

7    down the hall.  This is not someone who's thought out

8    what they're going to do.  It's not someone who came to

9    a carefully executed plan.  This is a guy who's still

10   mad and he's shooting off his mouth.  It's a guy whose

11   emotions and whose rage and whose anger are still

12   interfering with his judgment.

13          Heat of passion is rage.  Rage so much so

14   that your brain is not in the driver's seat when you're

15   doing what you're doing.  We have seen, right or wrong,

16   whether justified or not, Mr. Currie felt rage.  I don't

17   think anyone disputes that.  He was legitimately angry.

18   So angry that this was, for whatever reason, something

19   that he thought he had to do to get rid of her.  Why?

20   Because he's not thinking straight.

21          I mean, there's no way he's going to be able

22   to keep his job after he does this.  There's no way it's

23   going to make anything better when he does this.  It's

24   not going to improve his working conditions, it's not

25   going to mean that he's going to be able to keep his

1   job.  He can't keep his house.  He's not going to be

2   able to keep his family, right, this is not someone

3   who's thinking rationally.  Right?

4          Someone who was thinking rationally would've

5   found some other way to do something like this so that

6   they wouldn't have gotten caught.  No effort to do

7   anything like he wouldn't get caught.  Didn't even try

8   to run for the door.  Didn't wipe his phone, didn't turn

9   off his lights.  Didn't even grab his car keys.  This is

10  not someone who made a plan to do something.  This is

11  someone who reacted.

12         We talked about crimes of the head and

13  crimes of the heart.  Right?  This is not a head crime.

14         COURTROOM DEPUTY:  You have five minutes.

15         MR. BELL:  Thank you.  It's not a head

16  crime.  It's not a crime that was planned out.  It's not

17  a crime that was cooly contemplated.  It's not a crime

18  that a rational person - much less a person with a

19  bachelor's in computer science, minor in math, and a

20  former sailor with the United States Navy - was going to

21  come up with if they're in possession of all of their

22  faculties.

23         It's a reaction crime.  It's a crime when

24  someone's temper and anger and rage-- right or wrong,

25  whether they should've felt it or not, he did.  It's a

1   crime that occurs when someone loses it.  And when

2   someone loses it and commits a crime, it's not the same

3   thing as cool, collected judgment murder.  It's a

4   different crime.

5            It doesn't mean Mr. Currie gets out of here

6   without a conviction.  It doesn't mean that he doesn't

7   deserve to be punished, and it certainly doesn't mean

8   that Ms. Blanchard or Ms. Kilian deserve anything that

9   happened to them.  No one is asking you to answer those

10  questions.

11           You have a very simple question to answer;

12  was this a head crime or was it a heart crime?  The

13  overwhelming evidence in front of you is that this was a

14  heart crime.  A crime of rage, not reason.  And a crime

15  of anger, not planning.  We'd ask you to find Mr. Currie

16  guilty of attempted voluntary manslaughter and not

17  guilty of assault on Ms. Kilian.  Thank you.

18           THE COURT:  All right.  Ms. Flannigan, if

19  you're ready with the second part of your opening-- or

20  your closing argument.

21           MS. FLANNIGAN:  Well, we need to clear up

22  one thing.  Heat of passion doesn't mean you lose your

23  temper.  You just lost your temper and, therefore,

24  you're enraged and, therefore, you can do whatever you

25  want to do.  Because if that were the case, if that were

 1   the law, then hotheads all over the country when they

 2   get cut off in traffic would be justified in shooting at

 3   their victim.  That's not what Instruction No. 17 says.

 4          Instruction No. 17 says that if you're

 5   involved in a heat of passion, if you do lose your

 6   temper and-- and you feel provoked, it has to also

 7   provoke an ordinary and a reasonable person.  Would a

 8   reasonable person standing in Mr. Currie's shoes be so

 9   provoked that he would've committed the acts that he did

10   on September 7th?  And the answer is no.

11          One of the exhibits that we had was the

12   defendant's resume.  If he was so unhappy at his job, he

13   could go find a new one.  There was nothing that

14   prevented him from doing that.  And, in fact, if you

15   look at that e-mail, the reason that Ms. Blanchard ended

16   up with it was by accident.  The defendant's wife had

17   sent it to him and it says, you need to call for a phone

18   interview.  He was looking for another job.

19          There's no doubt that he didn't like Ms.

20   Blanchard.  Do you remember the testimony of Major

21   Zickefoose?  And she went back and she looked at his

22   very first evaluation.  He had failed his entire career

23   and he had been allowed to fail and now he had somebody

24   that was holding him accountable and he resented it.  He

25   resented it.

1          But when you look at whether or not he was

2   so enraged, remember the testimony of Catron, where he's

3   pacing in the hallway.  That was an hour beforehand.  An

4   hour beforehand.  He had plenty of time to go home, cool

5   off, do whatever he was going to do and not attack Katie

6   Blanchard that day.

7          Remember the testimony of Doctor Rowell, the

8   very last person who saw the defendant before he

9   attacked Katie Blanchard, the very last person.  He

10  said, went in, said good night to him, he looked like he

11  was packing up his stuff, getting ready to go.  He

12  didn't exhibit any signs of being enraged to such a

13  degree that he was going to set Katie Blanchard on fire.

14          And how did the defendant react?  If this is

15  a heat of passion, if he acted so out of character for

16  himself, so out of character for himself he would never

17  ordinarily do that except he just snapped, a switch was

18  flipped, how did he act afterward?  Did he show any sign

19  of remorse?  No.  Remember Nurse Horseman from Cushing

20  Hospital who said he sat there with that smirk on his

21  face the entire time.

22          The defense wants to say, well, this is such

23  a bad plan that he wasn't-- he had no escape plan, there

24  was no Plan B.  He didn't ever have any intention of

25  getting away with this.  He was proud of this.  He did

 1    something that made him feel good about himself.  He set

 2    her on fire, he tried to kill her.  And he was proud of

 3    it.  He wasn't trying to get away with it.

 4             The gasoline, you idiots; that's just

 5    another example of him being proud of what he had done.

 6    You idiots, don't you know what I've done?

 7             Head crime versus heart crime.  All of the

 8    things that he talked about; feeling emasculated,

 9    feeling picked on, feeling embarrassed and berated,

10    those are all motive.  They're not evidence of a heat of

11    passion.  A heat of passion has to be a fear or a rage

12    in which somebody would lose their normal self-control

13    and which another ordinary person would do too.

14             The typical example that everybody hears

15    about is you come home from work early and you catch

16    your wife in bed with another man and you just snap and

17    you shoot them both.  That didn't happen here.

18             The only other communication between the

19    defendant and Ms. Blanchard that day happened around

20    lunchtime.  She was trying to help him with a report.

21    And if-- if a boss trying to correct your work and help

22    you with a report is something that can cause a heat of

23    passion attack like this, then bosses all over this

24    country are going up in flames.

25             MR. BELL:  Objection.  May we approach?

1              (Proceedings had at the bench, outside the

2    hearing of open court).

3              THE COURT:  All right.

4              MR. BELL:  That's misconduct.  She's asking

5    for community protection by saying if you get--

6    (reporter interruption).  It's an improper basis for

7    closing argument, arguing that a verdict for attempted

8    voluntary manslaughter means that bosses are going to go

9    up in flames around the country.  That is--

10             MS. FLANNIGAN:  That's not what I said,

11   Judge.  I said that if that is the standard, if the

12   standard is you can just lose your temper and-- and

13   that's the only portion of heat of passion that's

14   relevant is that you, yourself, are subjectively losing

15   your temper--

16             THE COURT:  Right.  I didn't-- I didn't hear

17   a community-- appeal to the community.  I heard sort of

18   an analogy is what I heard.  So I'll overrule the

19   objection.

20             MS. FLANNIGAN:  Thank you, Your Honor.

21             (Proceedings continued in open court).

22             MS. FLANNIGAN:  That is not the standard.

23   As I said, if that's the standard, if your boss can't

24   correct you and expect that you will act as a reasonable

25   person, then that would justify these types of attacks.

1    The defendant could say, I lost my temper.  They made me

2    do it.  They were holding me accountable.  Did the

3    defendant have a right-- I mean, subjectively he clearly

4    was upset.  He didn't like Katie, didn't like her

5    holding him accountable.

6              But what he didn't have the right to do was

7    try to kill her.  He had the right to get a new job.  He

8    had the right to transfer out of the current job.  He

9    had the right to do a lot of things, but he didn't have

10   the right to try to kill her.

11             And we heard a lot of testimony about the

12   gasoline and the hands shaking and he went down to the

13   generator.  But you know where we didn't hear that

14   evidence?  We only heard it from the defense attorney as

15   he was standing up here just minute ago.  We didn't hear

16   a witness testify about it.  And remember the-- the

17   judge said that only what you hear from the witness

18   stand is evidence.  I didn't hear a single person

19   testify about what the defense just said.

20             But what we did hear, we heard that the

21   defendant was a manipulator.  Do you remember Major

22   Zickefoose?  Everything was great as long as Katie

23   wasn't there.  See, I can get my work done when Katie is

24   not there.  I can get it done within 40 hours a week

25   even if she's not here.  But what I can't do is I can't

1    do that when she is here.  Why not?  Because of her.

2    Because I don't like her.  That's his motive.  That's

3    not heat of passion.

4         So we have evidence that the defendant

5    planned this attack.  He brought the tools with him to

6    work.  Where-- where did he bring-- how did he get the

7    matches to work?  If he wasn't intending to set her on

8    fire, why did he bring those matches to work with him?

9    No evidence that he was a smoker.  No evidence that he

10   would need those as part of his job.  What about the

11   razor?  Clearly wasn't shaving with it.  He used those

12   tools.  He planned ahead and he brought those tools.

13        And there was an argument that said, you

14   know, if-- those searches on his phone about the-- try

15   to cut somebody's neck, how long would it take them to

16   die, that that would be fine and relevant if it

17   weren't-- if he had really tried to kill her that way.

18   Well, he did.  After he set her on fire.

19        Remember, he set her on fire from the head

20   down.  She had her back to him at the time of the

21   attack.  He came into her office, he snuck up behind

22   her.  She thought he was saying goodbye.  She turned

23   towards him.  All of a sudden he's splashing her with

24   gasoline which, by the way, would probably transfer onto

25   some of his clothes as he's splashing it.  That would

1    explain the smell of gasoline on his own clothes that

2    Nurse Horseman testified about.

3              And before she can react, he set her on

4    fire.  And both of those matches, those both were

5    burned.  One wasn't not burned.  He had set-- he had

6    struck two matches in order to get her to set on fire.

7              You know, the defendant said, you know, if

8    this were really a head crime, that he would've planned

9    it better and he would've tried to get away, and he

10   would've done a smarter job of planning this.  The

11   defendant is not charged with being smart.  Like I said,

12   he was proud of this.  He was proud of what he had done.

13             He went there that day intending to kill her

14   and he carried out such a brutal attack that he set her

15   on fire from the head down to her chest.  And then he

16   tried to cut her with a razor blade.  When the razor

17   blade wasn't working sufficiently, that's when he ran

18   back to his office to get scissors because he needed

19   another tool.

20             He grabbed that tool and he ran back with it

21   above his head intending to stab her to death.  He

22   wanted to finish the job that he had planned.  That's

23   why he went and got the scissors.  He had planned for

24   months.  Four months from the search on his phone until

25   the attack on her.

1            And only if you find that he didn't plan do

2    you even look at the question of whether this was a heat

3    of passion.  If the defendant-- if you find the

4    defendant planned this out ahead of time and he executed

5    his plan, you find him guilty of Count 1.

6            The defendant wants you to find him not

7    guilty of Count 2 with the attack on Ms. Kilian.  And

8    again, why was the defendant continuing to-- to stab

9    at-- what is the purpose of continuing to stab at Ms.

10   Kilian if it isn't to do bodily harm to her in order to

11   get her out of the way?  If all he wanted was to

12   accidentally injure her, if it was an accident, he

13   could've pushed her out of the way to get her out of the

14   way so he could continue his attack on Katie.

15           Ms. Kilian is an older lady and certainly

16   the defendant would've been able to push her out of the

17   way.  But, no, she-- Ms. Kilian said, I got in the way

18   to try to stop it.  He saw that Ms. Kilian was in the

19   way and so he swung that razor blade at Ms. Kilian

20   intending to hurt her so that she would get out of the

21   way.

22           Ladies and gentlemen, you heard a lot of

23   evidence and you've heard a lot of arguments, but I

24   would like for you to keep in mind what the judge's

25   instructions tell you.  The judge's instructions will

1  tell you that it's not enough that the defendant was

2  angry or upset or that he felt provoked.  It's whether

3  or not somebody in his shoes, somebody standing in the

4  defendant's shoes, a reasonable and ordinary person

5  would've been so provoked that they would've taken

6  similar actions.  And that's just not something you can

7  find.

8           The defendant planned to kill her.  He

9  brought the tools to do it.  And he intended on the day

10  of September 7th to murder her.  That was the day he had

11  scheduled for Katie Blanchard to die.

12           I ask that you find him guilty of Count 1 of

13  this indictment.  And I ask that you find him guilty of

14  Count 2 of this indictment with regard to the assault on

15  Ms. Kilian.  Thank you.

16           (3:30 p.m., closing arguments concluded).

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4      I, Kelli Stewart, a Certified Shorthand Reporter and

 5   the regularly appointed, qualified and acting official

 6   reporter of the United States District Court for the

 7   District of Kansas, do hereby certify that as such

 8   official reporter, I was present at and reported in

 9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 50 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED August 11, 2017.

15

16

17

18           /s/ Kelli Stewart

19           Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```